Windels Marx Lane & Mittendorf, LLP
120 Albany Street Plaza, 6th Floor
New Brunswick, New Jersey 08901
(732) 448-2533
Jay Samuels, Esq.
Attorneys for UPS Capital Business Credit

| | |
|---|---|
| Advent Pharmaceuticals, Inc. | : UNITED STATES BANKRUPTCY COURT |
| | : FOR THE DISTRICT OF NEW JERSEY |
| Debtor. | : CHAPTER 11 |
| | : CASE NO. 11-25437 |

### Application of Creditor UPS Capital Business Credit to Dismiss Debtor's Chapter 11 Proceeding or, Alternatively, for Relief from the Automatic Stay for Cause

UPS Capital Business Credit ("Movant"), a secured creditor in the above-captioned Chapter 11 case, by and through its attorneys Windels Marx Lane & Mittendorf, LLP, files this Application to Dismiss the Debtor's Chapter 11 Proceeding pursuant to 11 U.S.C. 1112(b) and otherwise for "cause" or, alternatively, for Relief From Automatic Stay for Cause pursuant to 11 U.S.C. 362(d) (the "Motion"). Movant relies on this Application, the Certification of Brian Rice, and the Certification of Jay Samuels.

### FACTUAL BACKGROUND

1. Debtor is the debtor and debtor in possession in the above-captioned Chapter 11 case, having filed a voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code") on May 18, 2011 (the "Petition Date"). No trustee has been appointed in this case.

{40346362:1}

## Movant's Claims and Interests

2. Movant is a secured creditor of Debtor, holding a security interest in both Debtor's tangible and intangible personal property and fixtures (the "Personal Property Collateral"), and in Debtor's real property and improvements located at 55 Lake Drive (Block 20, Lot 192), East Windsor, New Jersey (the "Real Property").

3. Movant's security interests in Debtor's Personal Property Collateral is established by security documents including Debtor's Security Agreements dated December 29, 2000, March 1, 2001 and June 15, 2001 (the "Security Agreements"), true copies of which are attached as Exhibit 1, and are perfected by UCC-1 filings with the New Jersey Department of the Treasury, true copies of which are attached as Exhibit 2.

4. Movant's interest in Debtor's Real Property is established and perfected by a Mortgage and Security Agreement dated December 21, 2000 (the "Mortgage") recorded in the Office of the Clerk of Mercer County on February 9, 2001 in Book 5730, Page 221 et seq. Movant's interest in Debtor's Real Property is further established and perfected by a Mortgage dated June 15, 2001 (the "Second Mortgage") recorded in the Office of the Clerk of Mercer County on June 20, 2001 in Book 6020, Page 173 and rerecorded on July 27, 2001 in Book 6119, Page 29 et seq. True copies of the Mortgage and the Second Mortgage are attached as Exhibit 3.

5. The Security Agreements and the Mortgage secure, inter alia, the obligations of the Debtor to the Movant consisting of loans from the Movant to the Debtor evidenced by Debtor's Notes dated December 21, 2000 in the original principal amount of $900,000.00; December 29, 2000 in the original principal amount of $1,000,000.00; and June 15, 2001 in the original principal amounts of $2,900,000.00 and $400,000.00, true copies of which are attached as Exhibit 4.

6. The amount due under the December 21, 2000 Note consists of principal of $696,749.35, accrued interest of $85,151.00 through May 23, 2011; accrued late charges of $26,242.18; real estate tax advances of $88,251.00 through May 23, 2011; property protective advances, including insurance of over $50,865.00 as are set forth below; and attorneys fees and other costs incurred by Movant.

7. The amounts due under the December 29, 2000 Note consists of principal of $57,382.62, accrued interest of $7,825.00 through May 23, 2011; accrued late charges of $4,107.59; costs in connection with Movant's secured party sale of equipment; and attorneys fees and other costs incurred by Movant.

8. The amounts due under the Notes of June 15, 2001 consist of principal of $2,555,481.53, accrued interest of $583,519.00 through May 23, 2011; accrued late charges of $82,312.65; real estate tax advances of $211,985.00 through May 23, 2011; property protective advances, including insurance of over $77,671.00; costs in connection with Movant's secured party sale of equipment; and attorneys fees and other costs incurred by Movant.

9. Movant has obtained an appraisal of the Real Property valuing the Real Property at $1,600,000.00 as of April 2011. A copy of the appraisal can be made available.

### The Shutdown of Debtor's Operations by the Food and Drug Administration

10. In early 2009, the United States Food and Drug Administration (the "FDA") brought suit against the Debtor and others for alleged violations of the laws and regulations administered by the FDA. A true copy of the FDA's Complaint as pulled from PACER is attached as Exhibit 5.

11. The FDA's Complaint resulted in the entry of an Injunction which, among other matters, precluded the Debtor from operating without subsequent FDA authorization [Paragraph

8 of the Injunction]. A true copy of the Injunction, entered April 9, 2009, as pulled from PACER is attached as Exhibit 6.

12. It is Movant's belief that the FDA has never lifted or modified the Injunction, and that it remains in full force and effect.

13. Movant also notes that Paragraph 20 of the Injunction required prior notice to the FDA before Debtor filed any bankruptcy proceeding. Movant has no way of knowing if such notice was provided.

### Movant's State Court Lawsuit, and Debtor's Lack of Operations

14. As a result of the default by Debtor in the payment and performance of its obligations to Movant, Movant commenced suit against the Debtor and others in the Superior Court of New Jersey, Law Division, Mercer County in August 2009 (the "State Court Suit").

15. Summary judgment was entered in favor of Movant and against Debtor (and all other defendants) in the State Court Suit. A true copy of the Summary Judgment Order dated March 22, 2010, is attached as Exhibit 7.

### Movant's Attempt to Hold a Secured Party Sale, Debtor's Absence of any Economic Activity, and Debtor's Failure to Pay or Perform its Obligations to Movant and Others

16. In approximately March of 2010, Movant commenced the process of accessing the Real Property and taking possession of Debtor's Personal Property Collateral and preparing the equipment for a secured party sale.

17. In the course of that preparation, and in connection with the extensive activities described below, Movant, through its auctioneer and various other representatives, including counsel, has had occasion to enter the Real Property numerous times over the entire period through the filing of the Petition. There has been no production, sales, or any other economic

activity of the Debtor at the Real Property or involving the use of the Debtor's Personal Property Collateral during that entire time period.

18. As Movant began to prepare for the secured party sale, it learned that the electricity at the Real Property had been shut off for nonpayment by the Debtor. In order to prepare for a sale, Plaintiff had to have electricity to the Real Property provided in a new account in Movant's name. Movant has paid $60,421.00 in electric charges for service to the Real Property through April 2011.

19. Movant's secured party sale was initially scheduled for April 27, 2010, and was noticed to the Debtor and others, including the FDA.

20. Before the sale was held, on approximately April 8, 2010, the East Windsor Fire Inspector appeared at the Real Property and advised the auctioneer that both the Real Property and the real property at 10 Lake Drive owned by TheraGen, Inc. (again, also a Debtor before this Court) were the subject of outstanding fire code violations dating back to inspections of the premises held in June 2009 and November 2009, that neither the Debtor nor TheraGen had remediated the fire code violations, and that no sales could be held until the fire code violations were remediated. True copies of the materials regarding the fire code violations as received from the East Windsor Fire Inspector are attached as Exhibit 8.

21. As a result of the fire code violations and the edict of the Fire Inspector, the April 27, 2010 secured party sale had to be cancelled.

22. Movant, with notice to Debtor, retained personnel to remediate the fire code violations. Remediation of the fire code violations was finally accomplished by Movant in March 2011, at a cost to Movant, relating to the Real Property, of $16,910.00.

{40346362:1}

23. In connection with the fire code violations, Movant also had to make roof repairs at the Real Property to prevent active water leakage, at a cost of approximately $27,000.00.

24. In order to maintain the fire alarm system, Movant has had to have phone service and fire alarm service provided to the Real Property. Movant has paid $2,030.00 in phone service charges and $5,175.00 in fire alarm charges for service to the Real Property through April 2011.

25. As the winter of 2010 – 2011 approached, Movant had to provide heat for the Real Property, as the gas service had been shut off for nonpayment by the Debtor. Movant had to have gas service to the Real Property provided in a new account in Movant's name. Movant has paid $13,230.00 in gas service charges for service to the Real Property through April 2011.

26. Movant was finally able to reschedule its secured party sale of Debtor's equipment for **May 19, 2011**. Again, the secured party sale was noticed, including to the FDA, and extensively advertised. The secured party sale was, of course, stayed by the Debtor's bankruptcy filing.

### Movant's Foreclosure Action and Sheriff's Sale, and Debtor's Further Failure to Pay or Perform its Obligations to Pay Taxes and Insurance

27. As a further result of the default by Debtor in the payment and performance of its obligations to Movant, Movant commenced a foreclosure against the Real Property in the Superior Court of New Jersey, Chancery Division, Mercer County (the "Foreclosure Action").

28. Debtor has been served, and has defaulted in the Foreclosure Action. There are numerous defendants in the Foreclosure Action, primarily judgments against Debtor (including against Debtor's former name, Neil Laboratories, Inc., as the title to the Real Property is still in that name). All of the other defendants in the Foreclosure Action have been served and have defaulted, except for one noncontesting Answer. A true copy of the portion of the Second

Amended Complaint in the Foreclosure Action setting forth the basis for joinder of the defendants with claims against the Debtor is attached as Exhibit 9.

29. The Debtor has not provided the required insurance against physical damage to the Real Property or the personal property assets. Movant has carried physical damage insurance for the Movant's interest (only) in the Real Property since approximately August 2009. Movant's cost for such insurance is $50,865.00 through April 2011.

30. The Debtor has not paid real property taxes relating to the Real Property for an extended period of time. Movant has advanced real property taxes and other charges due to the Tax Collector for the third and fourth quarters of 2008, and for all of 2009 in the amount of $88,251.00. Real property taxes remain due for 2010 and 2011 as per the tax search attached as Exhibit 10.

### Debtor's History of Unfulfilled Financial Angels

31. Over the course of the past 2 years, virtually every time Movant has proceeded to enforce its rights, the Debtor and/or TheraGen, Inc. have advised Movant of some alleged buyer or financing found by Debtor that will allegedly result in payment to Movant. A history of these matters was complied in connection with a prior motion for a stay filed by Debtor and TheraGen, Inc. in the State Court Action. That history, attached to the Certification of Michael Antonelli of Movant dated August 27, 2010 (paragraphs 23 – 25 and related Exhibits) filed in the State Court Action, accompanies this Application attached as Exhibit 11.

32. In no case have these alleged buyers or financing entities completed any transactions that resulted in any payment to Movant.

33. This pattern continued in the attempts of Debtor and TheraGen, Inc., in the week before Debtor's filing, to have Movant adjourn the secured party sale based on proposed

7

{40346362:1}

transactions which could not possibly have been consummated as proposed. True copies of materials regarding these proposals (with redactions) are attached as Exhibit 12.

### Postpetition Inaction of the Debtor and the Debtor's Inability to Reorganize

34. As of the date of this Application, the Debtor has not provided evidence of insurance on the Real Property or the tangible Personal Property Collateral, thus requiring Movant to maintain its insurance in place postpetition at a monthly cost of approximately $2,936.00.

35. As of the date of this Application, Movant has no communication that Debtor is establishing electric, phone, fire alarm, gas or any other service to the Real Property in Debtor's name, with the result that charges to Movant will continue postpetition, at a monthly cost of approximately $2,200.00 for electric, $65.00 for phone, $345.00 for fire alarm, and $2,900.00 for gas during the colder months.

## LEGAL ARGUMENT

### I
### THE DEBTOR'S BANKRTUPCY SHOULD BE DISMISSED FOR CAUSE

#### A.

#### "CAUSE" EXISTS UNDER SECTION 1112(B)

Under Bankruptcy Code Section 1112(b), the Court "shall" dismiss a Chapter 11 case (or convert the case to a Chapter 7), for "cause" if established by the movant, unless the Debtor (or other party) establishes "unusual circumstances" showing that dismissal is not in the best interests of creditors or the estate. Code Section 1112(b)(4) lists 16 non-exhaustive factors that may amount to cause.

Of these listed, nonexclusive factors, the one currently most relevant is "substantial or continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." Code Section 1112(b)(4)(A). In this case, the Debtor has no operations and no income. This is confirmed by the Debtor's schedules filed on June 1, 2100, which show no income in 2010 or 2011. Although the normal case for "loss to or diminution of the estate" would arise from operating losses, loss and diminution also exists in this circumstance, as the Debtor's mere existence imposes costs which must be paid. As is set forth above, the Debtor is not paying even the most basic costs of its continued existence – utilities, insurance and real estate taxes. These are, or inevitably will be, borne by the Movant (or, under the most optimistic valuation scenario, by some other set of creditors). Where a Debtor is unable to pay its monthly expenses, Section 1112(b)(4)(A) is properly invoked. In re Park, 436 B.R. 811, 817 (B. Ct. W.D. Va. 2010).

As the Code recognizes, either is an inappropriate outcome in the absence of a reasonable likelihood of rehabilitation. This returns us to the lack of operations and income. The Debtor is

9

{40346362:1}

wholly dependant on some third party, not otherwise obligated to provide funding, to fund any reorganization. As set forth above, previous efforts of the Debtor in this regard have been either stillborn or certainly have not resulted in Debtor achieving any stable operations.[1] Alternatively, the Debtor is dependant on a sale of alleged assets. Unless the Debtor can show by specific facts, not hopes or handwritten agreements incapable of consummation, that it is able to effect a Plan of Reorganization in accordance with the requirements of Code Section 1112(b)(2)(A), this proceeding must be dismissed. In re Park, supra, at 817-819 (finding that a debtor whose ability to rehabilitate was premised on selling assets did not have such ability in the documented absence of asset sales).

### B.

### "CAUSE" EXISTS DUE TO THE ABSENCE OF A GOOD FAITH FILING

In addition to the specific factors provided under Code Section 1112(b), it is well settled that Chapter 11 proceedings are subject to dismissal for "cause" if not filed in good faith. In re Integrated Telecom Express, Inc. 384 F.3d 108, 118 (3d Cir. 2004); In re SGL Carbon Corp., 200 F.3d 154, 159-62 (3d Cir. 1999). The Debtor has the obligation of establishing "good faith." Id. at 162, n.10.

In determining what constitutes good faith, the Third Circuit has focused on two broad inquiries "that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate; and (2) whether the petition is filed merely to obtain a tactical litigation advantage." Integrated Telecom, supra, at 119-120.

---

[1] Thirteen of the Debtor's 20 largest creditors appear to be private lenders, with a total due to them of over two million dollars.

{40346362:1}

As there is no going concern, the petition of the Debtor in this case cannot be said to be preserving the going concern. Nor can it legitimately be said to be maximizing the value of the Debtor's estate. As set forth above in great detail, for nearly two years, the Debtor has been unable to either sell, or to monetize through financing, its alleged assets.[2] There is no legitimate basis to believe that circumstances have changed, and that the Debtor somehow now has the ability to monetize its its Carisoprodol ANDA.[3] listed in item 23 of Debtor's Schedule B. There are nine other ANDAs for the identical product. The Debtor's ANDA was issued in 2005. If the Debtor ever manufactured the product, it has certainly not done so in the over 2 years since the FDA Injunction. The Debtor cannot manufacture the product unless and until the FDA Injunction is lifted and the facility is recertified. Cf. In re Gilbert Broadcasting Co. 54 B.R. 2, 4 (Bankr.D.N.J. 1984) (a petition filed by a debtor not engaged in any business activity and with no intention of doing so in the foreseeable future has been held to not fulfill the primary purpose of reorganization or rehabilitation of a business enterprise and is therefore not filed in good faith.).

The Debtor's petition was unquestionably intended to stay the Movant's secured party sale of equipment, which had been scheduled for May 19, 2011. That sale, now stayed, would have generated funds to pay the obligations due to Movant. The Court in Integrated Telecom plainly stated that the protection of the automatic stay is not a *per se* justification for a bankruptcy filing, and that a desire to take advantage of the automatic stay, standing alone, does not establish good faith. Id. at 127-128. Thus, in the absence of any reasonable likelihood that the

---

[2] Debtor's Schedule B, item 22 lists two Ibuprofen ANDAs as assets. These were sold by Movant, as secured party, prepetition, on full and complete notice to Debtor. The Notice, which included the actual sale contract, and which was also sent to Debtor's then-counsel, and the Debtor's response, are attached as Exhibit 13.

[3] The Food and Drug Administration Orange Book pages relating to Carisoprodol, and to the Debtor's ANDA for it, are attached as Exhibit 14.

11

{40346362:1}

Debtor can effect a "valid bankruptcy purpose," the Debtor's desire to stay Movant's exercise of its rights does not constitute good faith and is insufficient to support this petition, and this matter must be dismissed.

## II

### IN THE ALTERNATIVE, MOVANT IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY PURSUANT TO §362(d)(1)

In the alternative, the Movant seeks relief from the stay pursuant to Bankruptcy Code §362(d)(1) to allow the Foreclosure Action to proceed, and permit Movant's secured party sale of the equipment Personal Property Collateral to take place.

Bankruptcy Code §362(d)(1) permits the Court to grant relief from the stay for "cause." The term "cause" is not defined under the Bankruptcy Code, therefore relief must be determined on a case by case basis. In re Mid-Atlantic Handling Systems, LLC, 304 B.R. 111, 129-30 (Bankr.D.N.J. 2003). As ststed in the statute, lack of adequate protection of an interest in property is one basis for granting relief for cause. Movant believes that the facts set forth above, including the continued inability of the Debtor to fund postpetition obligations for utilities, insurance and real property taxes, together with the Debtor's patent inability to reorganize, clearly constitute a lack of adequate protection of Movant's interests, and therefore "cause." The burden is on the Debtor to show that Movant is not entitled to this relief. In re Telegroup, Inc., 237 B.R. 87, 91 (Bankr.D.N.J. 1999).

Additionally, without waiver of Movant's assertion of its security interests in the Debtor's alleged intangible assets, nothing in the granting of relief with respect to the Real Property or with respect to the equipment Personal Property Collateral affects the Debtor's ability to attempt to monetize the alleged intangible assets. As noted above, the Carisprodol product, even if it was ever produced by the Debtor, has not been produced for over 2 years. The

cost of dealing with the FDA, making Debtor's facility operational, and the need to pay Movant's liens against the Real Property and the equipment Personal Property Collateral in order for any buyer to utilize that asset, are detriments to any potential buyer, serving to diminish any potential buyer pool, which might be enhanced by a stand-alone offering of the asset.

In sum, there is no proper basis to deny Movant relief from the automatic stay in order to permit Movant to proceed with Movant's the secured party sale of the equipment Personal Property Collateral, and to continue the Foreclosure Action. Allowing these matters to proceed will permit Movant to recover funds to which it is entitled. Continuing the stay will have no effect except to diminish the value of Movant's collateral.

## Conclusion

For all of the foregoing reasons, the Debtor's bankruptcy petition should be dismissed or, alternatively, Movant should be granted relief from the automatic stay to proceed with the sale of Movant's the secured party sale of the equipment Personal Property Collateral, and to continue the Foreclosure Action.

>Respectfully submitted
>
>Windels Marx Lane & Mittendorf, LLP
>Counsel for UPS Capital Business Credit
>
>By:_____/s/_____
>            Jay Samuels

Dated: June 2, 2011

{40346362:1}