EXECUTION COPY

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is made and entered into as of September 12, 2011, by and between Advent Pharmaceuticals, Inc., a New Jersey corporation ("**Seller**"), and BioComp Pharma, Inc., a Texas corporation ("**Buyer**"). Teich Groh, an association of professional corporations and limited liability companies, joins in this Agreement solely with respect to agreeing to serve as Escrow Agent for the Escrow Amount pursuant to Section 2.10 and ARTICLE IX.

## W I T N E S S E T H:

WHEREAS, on May 18, 2011 (the "**Filing Date**"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") Case No. 11-25437-KCF (the "**Bankruptcy Case**"); and

WHEREAS, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase and acquire from Seller the Acquired Assets free and clear of all liens, claims, encumbrances, liabilities and other obligations and interests, all as more specifically set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements of the parties hereinafter set forth, the parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For purposes of this Agreement, capitalized terms shall have the meanings specified or referred to in **Exhibit A** hereto.

## ARTICLE II.
## SALE OF ACQUIRED ASSETS

2.01    Sale of Acquired Assets. Subject to the terms, provisions, and conditions of this Agreement, and in accordance with, and to the extent not modified by, the Approval Order of the Bankruptcy Court, Buyer agrees to purchase and accept delivery of, and Seller hereby agrees to transfer, sell, assign, and convey to Buyer on the Closing Date, all of the right, title and interest of Seller and its Affiliates in and to all the business, properties and assets of whatever kind and nature, real or personal, tangible or intangible, owned, leased, licensed, used or held for use or license by or on behalf of Seller and/or its Affiliates that are related to and include (collectively, the "**Acquired Assets**"):

(a)    the Abbreviated New Drug Application filed with and approved by the FDA for manufacturing and marketing Carisoprodol 350 mg and any related documentation, studies and data ("**ANDA 40-576**", also referred to herein as the "**ANDA**");

(b)    the Purchased IP;

(c)      all Permits that are capable of being transferred from Seller or its Affiliate under Applicable Laws, and all rights of Seller or any of its Affiliates under such Permits and any and all pending applications relating to any such Permits (the "*Transferred Permits*");

(d)      all current and past raw material suppliers and contact information, drawings, notebooks, specifications and creative materials, whether written or electronically stored or however otherwise recorded, maintained or stored, including research and development reports and records, pre-clinical studies, manufacturing documents (including drug master files, batch records, master batch records, deviations, OOS investigations, CAPA, material specifications, and product-specific standard operating procedures, methods validation documentation and assays required for cGMP manufacturing), clinical protocols, clinical studies, pre-clinical and clinical data, results and analyses used in or resulting from any pre-clinical study or clinical trial of any Product, all regulatory files (together with all correspondence associated with such regulatory files), copies of the approved label components to the extent available, all labeling decision documents, and each Product's safety database, together with all documents, files, diagrams, specifications, designs, schematics, reports, records, laboratory notebooks, data, prototypes, test devices, models and simulations in Seller's or its Affiliates' possession in any media, to the extent it discloses or embodies Purchased Know-How (collectively, the "*Acquired Asset Documentation*").

All of the Acquired Assets shall be sold on an AS-IS, WHERE-IS basis, with no guarantees or warranties, except as otherwise provided in this Agreement.

2.02    Excluded Assets.  Notwithstanding the foregoing, Seller shall retain and shall not transfer to Buyer, and the term "Acquired Assets" shall not include any other assets other than the Acquired Assets (collectively, the "*Excluded Assets*").

2.03    Purchase Price; Payment.  As consideration for the transfer, sale, assignment, and conveyance of the Acquired Assets to Buyer, Buyer shall pay to Seller an amount equal to $150,000 (the "*Purchase Price*"), which shall be payable in two (2) installments. First, the Buyer shall deliver to the Escrow Agent a down payment of twenty percent of the Purchase Price, equaling $30,000.00, upon the execution of this Agreement, which shall be paid to Seller in accordance with Section 2.10 below.  Second, the remaining balance of the purchase price shall be paid to the Seller at Closing by wire transfer of immediately available funds to an account designated by Seller.

2.04    Excluded Liabilities.    Buyer shall not, directly or indirectly, assume any liabilities, obligations, or responsibilities of Seller of any nature whatsoever whether liquidated or unliquidated, known or unknown, actual or inchoate, accrued, contingent or otherwise, and whether arising from facts existing or events occurring prior to, on, or after the Effective Time (the "*Excluded Liabilities*").

2.05    Closing; Effective Time.  The consummation of the transactions provided for in this Agreement (the "*Closing*") shall take place on the earlier of (i) October 17, 2011, or (ii) the satisfaction or written waiver of all of the conditions to the obligations of the parties to consummate the transactions contemplated hereby, as set forth in ARTICLE VII and ARTICLE VIII of this Agreement, at the offices of TheraGen, Inc., 10 Lake Drive, East Windsor, New

Jersey 08520, or such other place, time, and date as the parties may mutually agree. The date, as thus determined, on which the Closing is to take place is referred to herein as the "**Closing Date**." The transactions hereunder shall be effective at the close of business, San Antonio, Texas time, on the Closing Date or such other time and date as the parties may mutually agree in writing. The time and date, as thus determined, on which the transactions hereunder shall be effective is referred to herein as the "***Effective Time***."

2.06    Conveyance and Transfer.    Seller hereby agrees that, at the Closing, it shall deliver to Buyer:

(a)    the Acquired Assets;

(b)    an Assignment and Bill of Sale substantially in the form attached hereto as **Exhibit B**, duly executed by Buyer and Seller, to transfer the Acquired Assets from Seller to Buyer, including, without limitation, the Purchased IP and Transferred Permits (the "***Bill of Sale***");

(c)    letters to the FDA to be effective on the Effective Date and transferring all Transferred Permits granted or administered by the FDA, duly executed by Buyer and Seller ("***FDA Transfer Letters***");

(d)    one or more assignments, in form and substance reasonably acceptable to Buyer, to transfer the Purchased IP, duly executed by Seller and dated to be effective on the Effective Date (the "***Purchased IP Assignments***");

(e)    a U.S. instrument of assignment to be effective on the Effective Date, in form and substance reasonably acceptable to Buyer with respect to Transferred Permits, and other Acquired Assets that are not tangible personal property to be transferred under U.S. Applicable Laws (the "***IP Assignments***", together with the Bill of Sale, FDA Transfer Letters, and Purchased IP Assignments, the "***Transfer Documents***"); and

(f)    all other bills of sale, endorsements, assignments, releases, and other good and sufficient instruments of transfer, assignment, and conveyance, in form satisfactory to Buyer and its counsel, as shall be effective to convey to Buyer good, indefeasible, and marketable title in and to all of the Acquired Assets and all other documents and instruments required to be delivered by the pursuant to this Agreement.

2.07    Further Assurances.    Seller hereby agrees that, from time to time, at Buyer's request and without further consideration, it will execute and deliver to Buyer such other and further instruments of conveyance, assignment and transfer and take such other action as Buyer may reasonably require to effectuate the transactions contemplated by this Agreement.

2.08    Taxes.    Except for taxes owed by Buyer as a result of its use and operation of the Acquired Assets from and after the Effective Time, Buyer shall have no liability or responsibility for any income, franchise, excise, sales, use, property or other taxes, duties, fees charges or imposts of any kind relating to or arising out of the transaction contemplated by this Agreement. Seller shall be solely responsible for the payment of sales, transfer, and use taxes, or other taxes,

duties, fees, charges or imposts of any kind, arising out of the sale, transfer, and assignment of the Acquired Assets.

2.09    <u>Acquired Asset Documentation</u>. Subject to the terms and conditions hereof, on or before the Closing Date, Seller shall deliver to Buyer original copies of all Acquired Asset Documentation. Such Acquired Asset Documentation and other data shall be open for inspection and copying by Seller at any time during regular business hours for a period of five (5) years from the Effective Time.

2.10    <u>Escrow</u>.

(a)    The Buyer and Seller hereby appoint Teich Groh as their escrow agent for the purposes set forth herein (the "*Escrow Agent*").

(b)    Buyer agrees to deposit with the Escrow Agent the amount of $30,000.00 (the "*Escrow Amount*") in immediately available funds in Escrow Agent's IOLTA account ("*Escrow Account*") upon the execution hereof, which represents the down payment of twenty percent of the Purchase Price as provided for in <u>Section 2.03</u> above. The Escrow Agent shall hold the Escrow Amount in accordance with the terms and conditions set forth herein, and subject to the terms and conditions hereof. The Escrow Agent is authorized and directed to deposit and hold the Escrow Amount in Escrow Agent's IOLTA Account, and transfer the Escrow Amount only as provided herein.

(c)    Except as otherwise expressly provided in this <u>Section 2.10</u>, upon the joint written instructions of the Buyer and Seller, the Escrow Agent shall pay the Escrow Amount to the party specified in such joint instructions.

(d)    Notwithstanding <u>Section 2.10(c)</u> above, upon the termination of this Agreement pursuant to <u>Section 9.01</u>, the Escrow Agent shall disburse the Escrow Amount as follows: (i) upon termination pursuant to <u>Section 9.01(a)(i)</u>, the Escrow Agent shall return the Escrow Amount to Buyer pursuant Buyer's written instructions; (ii) upon termination pursuant to <u>Section 9.01(a)(ii)</u>, the Escrow Agent shall disburse the Escrow Amount to the non-breaching party pursuant to the non-breaching party's written instructions to the Escrow Agent; (iii) upon termination pursuant to <u>Section 9.01(a)(iii)</u>, the Escrow Agent shall disburse the Escrow Amount to the party which terminated the Agreement pursuant to such section pursuant to written instructions to the Escrow Agent from such party; and (iv) upon termination pursuant to <u>Section 9.01(a)(iv)</u>, the Escrow Agent shall return the Escrow Amount to Buyer pursuant Buyer's written instructions.

(e)    The amounts held in the Escrow Account shall be for the exclusive benefit of the parties and their respective successors and assigns and no other person, firm or corporation shall have any right, title or interest therein. Any claim of any person to the amounts held in the Escrow Account, or any part thereof, shall be subject and subordinate to the prior right thereto and lien of the parties.

(f)    The Escrow Agent shall have only those duties as are specifically and expressly provided herein. Any compensation owed to Escrow Agent for services rendered by

Escrow Agent hereunder shall be paid entirely by Seller. Buyer shall have no obligation to compensate Escrow Agent with respect to such services.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

3.01    <u>Organization, Power, and Subsidiaries of Seller</u>.  Seller is a corporation duly organized under the laws of the State of New Jersey.

3.02    <u>Authority for Agreements</u>.  Subject to approval of the Bankruptcy Court, Seller has the requisite corporate power and authority to enter into this Agreement and to carry out its obligations hereunder.  Subject to the entry and effectiveness of the Approval Order, the execution and delivery of this Agreement and all other agreements, instruments, and documents that are contemplated by this Agreement and the performance of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate and other action on the part of Seller and when executed and delivered on behalf of Seller, upon the approval of the Bankruptcy Court, this Agreement will constitute a valid and legally binding obligation of Seller enforceable against Seller in accordance with its terms.

3.03    <u>Sale Pursuant to 11 U.S.C. §363</u>.  Seller shall sell the Acquired Assets to Buyer, subject to the approval of the Bankruptcy Court, free and clear of any liens or encumbrances pursuant to Section 363 of Title 11 of the United States Code.

3.04    <u>Infringement and Misappropriation</u>.  Except as set forth on <u>Schedule 3.04</u>, to Seller's knowledge, the use of the Acquired Assets will not interfere with, infringe upon, or misappropriate any Intellectual Property rights of third parties, and neither Seller nor any of its Affiliates has received any charge, complaint, claim, demand, notice mentioning a third party Intellectual Property rights or notice alleging any such interference, infringement or misappropriation (including any claim that Seller or its Affiliate must license or refrain from using any Intellectual Property of any third party in connection with the use of the Acquired Assets).

3.05    <u>Consents</u>.  Except for the Approval Order and as set forth on <u>Schedule 3.05</u> attached hereto, to Seller's knowledge, there are no (i) consents or approvals of any public body or authority, (ii) filings with any public body or authority, or (iii) notices, consents or waivers from other parties to any of the Acquired Assets, including, but not limited to, the ANDA or other documents or instruments, that are required for the lawful consummation of the transactions contemplated hereby.

3.06    <u>Regulatory and Related Matters</u>.

(a)    Neither Seller nor any of its Affiliates has with respect to the Acquired Assets, since January 1, 2009 received any (i) written notice from the FDA or any other Governmental Authority, including the Office of Inspector General, any United States Attorney, the Department of Justice or any attorney general of any jurisdiction, alleging any violation of

any Drug Law, The False Claims Act (31 U.S.C. § 3729–3733) or false claims acts under state Applicable Laws, commencing or indicating an intention to conduct an investigation, audit, or review; (ii) notice of inspectional observation (including those recorded on form FDA 483), establishment inspection report, warning letter, penalty, fine, sanction, request for recall or other remedial action; or (iii) other written documents issued by the FDA or any other Governmental Authority alleging lack of compliance with any Drug Law by Seller, any of its Affiliates, or Persons who are otherwise performing services for the benefit of Seller or any of its Affiliates.

(b)   Neither Seller nor any of its Affiliates, agents or subcontractors has, with respect to the Acquired Assets, made an untrue statement of a material fact or fraudulent statement to the FDA or any other Governmental Authority or to any physician or customer, failed to disclose a material fact required to be disclosed to the FDA or any other Governmental Authority or to any physician or customer, or committed any material act, made any material statement, or failed to make any material statement, that would reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Fact, Bribery, and Illegal Gratuities", set forth in FDA's Compliance Policy Guide Sec. 120.100 (CPG 7150.09). Neither Seller nor any of its Affiliates, agents, or subcontractors has, with respect to the Acquired Assets, (i) been convicted of any crime or engaged in any conduct that would reasonably be expected to result in or that has resulted in permanent debarment or disqualification by any Governmental Authority, and (ii) any knowledge of facts that would lead to a false claim, or other proceedings or debarment, and there are no proceedings pending or threatened that would result in criminal liability or permanent debarment or disqualification by any Governmental Authority, in each case above, which criminal liability or permanent debarment or disqualification would reasonably be expected to be material to the Acquired Assets.

3.07   Broker's or Finder's Fees.  No agent, broker, person or firm acting on behalf of Seller is, or will be, entitled to any commission or broker's or finder's fees from any of the parties hereto, or from any affiliate of the parties hereto, in connection with any of the transactions contemplated by this Agreement.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.01   Organization and Standing of Buyer.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas.  Buyer is duly qualified to do business in all states in which the nature of its business or the character of its properties requires it to be so qualified, except where the failure to be so qualified would not have a material adverse effect on Buyer.

4.02   Authority for Agreement.  Buyer has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate and other action on the part of

Buyer, and this Agreement constitutes a valid and legally binding obligation of Buyer in accordance with its terms.

4.03    Broker's or Finder's Fees.  No agent, broker, person or firm acting on behalf of Buyer is, or will be, entitled to any commission or broker's or finder's fees from any of the parties hereto, or from any affiliate of the parties hereto, in connection with any of the transactions contemplated by this Agreement.

4.04    Non-Contravention; No Consents.

(a)    Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the transactions contemplated by this Agreement ("*Contemplated Transactions*") by Buyer will give any person the right to prevent, delay or otherwise interfere with any of the Contemplated Transactions pursuant to:

(i)    any provision of Buyer's certificate of formation or bylaws;

(ii)    any resolution adopted by the board of directors or the shareholders of Buyer; or

(iii)    any contract or agreement to which Buyer is a party or by which Buyer may be bound.

(b)    Except for the Approval Order, Buyer is not and will not be required to obtain any consent from any person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

## ARTICLE V.
## COVENANTS OF SELLER

Seller covenants and agrees with Buyer as follows:

5.01    Conduct Prior to Effective Time.  Unless otherwise expressly consented to in writing by Buyer, from and after the date of this Agreement through the Effective Time, Seller agrees to:

(a)    keep and preserve the Acquired Assets in good condition and repair;

(b)    comply in all material respects with and perform in all material respects all obligations and duties imposed upon Seller relating to the Acquired Assets by all Applicable Laws;

(c)    cause Buyer, its counsel, accountants, and other representatives, to have full access, during normal business hours, to the properties, books, and records of Seller relating to the Acquired Assets and furnish to Buyer and its representatives during such period all such information concerning the Acquired Assets as Buyer or its representatives may reasonably request;

(d)     file all clinical trial information and updates and other similar filings required by the FDA, and any other national clinical trial registry, on a timely basis, to the extent such filings relate to the Acquired Assets;

(e)     consult with Buyer prior to taking any action or entering into any transaction that could reasonably be expected to be material to the Acquired Assets; and

(f)     as it relates to the Acquired Assets, inform Buyer promptly (i) after receipt of any material non-written or any written communication between Seller and its Affiliates, on the one hand, and the FDA or any similar foreign Governmental Authority, on the other hand, or inspections of any manufacturing facility or clinical trial site and where reasonably practicable before giving any written submission to the FDA or any similar foreign Governmental Authority, and (ii) where possible prior to making any material change to a study protocol, adding new trials, making any material change to a manufacturing plan or process or making a material change to a development timeline.

5.02    Advice of Change.  Seller shall advise Buyer in writing prior to the Effective Time of any material adverse change, or the occurrence of any event that involves any substantial possibility of any material adverse change, in the condition, financial or otherwise, to the Seller's business or the Acquired Assets that has occurred since the date of this Agreement.

5.03    Notification.  Between the date of this Agreement and the Closing Date, Seller shall promptly notify Buyer in writing if Seller becomes aware of any fact or condition that causes or constitutes a breach of Seller's representations and warranties as of the date of this Agreement, or if Seller becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition.  Should any such fact or condition require any change in the Schedules attached hereto if such Schedule were dated the date of the occurrence or discovery of any such fact or condition, Seller will promptly deliver to Buyer a supplement to such Schedule specifying such change.  During the same period, Seller will promptly notify Buyer of the occurrence of any breach of any covenant of Seller in this ARTICLE V or of the occurrence of any event that may make the satisfaction of the conditions in ARTICLE VII or ARTICLE VIII impossible or unlikely.

5.04    Bankruptcy Covenants.

(a)     Seller shall at its sole cost and expense, file a motion, pursuant to 11 U.S.C. §§ 105, 363 and, to the extent applicable, § 365 to approve the sale of the Acquired Assets to Buyer pursuant to this Agreement (the "*Approval Motion*").  Seller shall use its commercially reasonable efforts to obtain an order approving the Approval Motion (the "*Approval Order*") on or before October 25, 2011, but in any event fourteen (14) days prior to the Closing Date, which order shall be in form and substance reasonably acceptable to Buyer. With respect to the Approval Order, Seller shall seek entry of such specifically finding Buyer to be a good faith purchaser for value and otherwise entitled to the protections of Section 363(m) of the Bankruptcy Code. Nothing in this Section 5.04 shall be deemed to extend the Closing Date hereof.

(b)    Seller shall promptly provide Buyer with all documents, motions, orders, filings or pleadings that Seller files with the Bankruptcy Court which relate to the consummation or approval of this Agreement or the Approval Motion, related orders, or any provision herein or therein. Seller shall also promptly (within 24 hours) provide Buyer with electronic or facsimile copies of all pleadings received by or served by or upon the Seller in connection with its Bankruptcy Case, which have not otherwise been served on Buyer.

(c)    From and after the date hereof, Seller shall not take any action or fail to take any action, which action or failure to act would reasonably be expected to (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement, or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner which would reasonably be expected to materially and adversely affect Buyer's rights hereunder), or (B) the entry of a stay pending appeal, in the cases of each of sub-clauses (A) or (B) of this section, with respect to the Approval Order.

5.05    Discharge of Liens. The Acquired Assets shall be transferred pursuant to the Approval Order, free and clear of all liens, claims, encumbrances, liabilities and other obligations and interests of Seller, with all such liens, claims, encumbrances, liabilities and other obligations and interests of Seller to attach to the Purchase Price to be received by Seller hereunder.

5.06    Transfer of Permits.

(a)    Promptly after the date hereof, the parties will collaborate to determine a timetable and procedure for the transfer or re-issuance to Buyer of all Permits used in the Acquired Assets. The parties shall, and shall cause their Affiliates to, use commercially reasonable efforts to (a) provide the required notices to, and/or obtain the authorizations, approvals, consents or waivers from, Governmental Authorities and third parties in order to transfer all Transferred Permits to Buyer or its Affiliates, and/or to enable Buyer or its Affiliates to obtain its or their own substitute Permits for the Acquired Assets, and (b) to the extent permitted under Applicable Law and/or the issuing body of a Permit, allow Buyer or its Affiliates to distribute, market, import and sell Products from and after the Closing while the applicable Permit remains held by Seller or an Affiliate or until Buyer or its Affiliates can obtain its or their own Permit.

(b)    If a Transferred Permit is not transferred at Closing or Buyer or its designee has not obtained a substitute Permit required to distribute, market, import and sell a Product at the time of the Closing, then, in accordance with the timetable and procedure determined by the parties, at the request of Buyer, the parties shall use commercially reasonable efforts to (a) enter into such contractual relationships with one another and/or, as appropriate, their respective Affiliates, and (b) do, execute, acknowledge and deliver all such further acts and other instruments and papers as may be reasonably required or appropriate, to enable the marketing, distribution, importation and sale of Products after the Closing. Any such contractual arrangement must be consistent with Applicable Law and the applicable Permit.

5.07    Confidentiality. The parties hereby agree that certain Confidential Disclosure Agreement effective as of December 14, 2010 by and between Buyer and Seller (the

"*Confidential Disclosure Agreement*") shall remain in full force and effect pursuant to the terms and conditions set forth in the Confidential Disclosure Agreement.

## ARTICLE VI.
## COVENANTS OF BUYER

Buyer covenants and agrees with Seller as follows:

6.01   Cooperation.   Subject to the terms and conditions herein provided, Buyer will use commercially reasonable efforts to take, or cause to be taken, such action, to execute and deliver, or cause to be executed and delivered, such additional documents and instruments and to do, or cause to be done, all things necessary, proper or advisable under the provisions of this Agreement and under applicable law to consummate and make effective all the transactions contemplated by this Agreement.

6.02   Further Actions.   At the Closing, Buyer shall deliver to Seller such other documents, certificates, instruments or agreements as Seller may reasonably request which Buyer is required to deliver to Seller pursuant to this Agreement.

## ARTICLE VII.
## CONDITIONS TO OBLIGATIONS OF SELLER

All obligations of Seller to be discharged under this Agreement are subject to the fulfillment, prior to or at the Closing, of each of the following conditions, unless waived in writing by Seller at any time prior to or at the Closing:

7.01   Representations and Warranties of Buyer.   All of the representations and warranties of Buyer contained in this Agreement shall be true as of the date of this Agreement. All such representations and warranties shall be deemed to have been made again as of the Closing Date and shall be true as of the time of the Closing and Buyer shall have executed and delivered to Seller a certificate to such effect dated the Closing Date.

7.02   Covenants and Agreements of Buyer.   Buyer shall have caused all covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing to be so performed or complied with and Buyer shall have executed and delivered a certificate to Seller to such effect dated the Closing Date.

7.03   Bankruptcy Court Approval.   The sale of the Acquired Assets by Seller to Buyer as contemplated by this Agreement shall have been approved by the Bankruptcy Court pursuant to the Approval Order which shall specifically approve the sale free and clear of all interests pursuant to 11 U.S.C. § 363.

7.04   Joint Instructions.   Buyer shall have executed and delivered joint written instructions to the Escrow Agent to release the Escrow Amount to Seller.

EXECUTION COPY

# ARTICLE VIII.
## CONDITIONS TO OBLIGATIONS OF BUYER

All obligations of Buyer to be discharged under this Agreement at the Closing are subject to the fulfillment, prior to or at the Closing, of each of the following conditions, unless expressly waived in writing by Buyer at any time prior to or at the Closing, and Buyer shall have the right to terminate this Agreement if the following conditions have not been fulfilled at the Closing:

8.01    Representations and Warranties of Seller.    All of the representations and warranties of Seller contained in this Agreement shall be true as of the date of this Agreement. All of such representations and warranties shall be deemed to have been made again as of the Closing Date and shall be true as of the time of Closing, without giving effect to any supplement to the Schedules attached hereto, and Seller shall have executed and delivered to Buyer a certificate to such effect dated the Closing Date.

8.02    Covenants and Agreements of Seller.    Seller shall have caused all covenants, agreements, and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing to be so performed or complied with and Seller shall have executed and delivered to Buyer a certificate to such effect dated the Closing Date.

8.03    Consents.    All of the consents necessary to transfer all of the Acquired Assets to Buyer from and after the Effective Time shall have been secured in a form reasonably satisfactory to Buyer and Seller shall have executed and delivered to Buyer a certificate to such effect dated the Closing Date.

8.04    No Material Adverse Changes.    There shall not have been any material adverse changes to the Acquired Assets or Seller's business prior to the Closing and Seller shall have executed and delivered to Buyer a certificate to such effect dated the Closing Date.

8.05    No Litigation Threatened.    Except for the Bankruptcy Case, no proceeding shall have been instituted or, to the knowledge of Seller, threatened to restrain or prohibit the transactions contemplated herein, and Seller shall have executed and delivered to Buyer a certificate to such effect dated the Closing Date.

8.06    Bankruptcy Court Approval.    The sale of the Acquired Assets by Seller to Buyer as contemplated by this Agreement shall have been approved by the Bankruptcy Court pursuant to the Approval Order, which shall specifically find Buyer to be a good faith purchaser for value and otherwise entitled to the protections of Section 363(m) of the Bankruptcy Code and shall be a final order and in full force and effect, and not stayed, modified, vacated, amended or revoked.

8.07    Governmental Approvals.    All Governmental Authority and other consents and approvals necessary (i) to permit the consummation of the transactions contemplated by this Agreement, and (ii) for Buyer to own the Acquired Assets shall have been received, except where the failure to obtain such consent or approval would not have a material adverse effect on the Acquired Assets or is not required for the lawful consummation of the transactions contemplated hereby or necessary in order for the ownership of the Acquired Assets to be vested in Buyer immediately after the Closing.

8.08    Simultaneous Close. Buyer's obligations under this Agreement are subject to the simultaneous consummation of the transactions contemplated by (i) that certain Asset Purchase Agreement executed as of the date hereof between Buyer and Theragen, Inc., a Delaware corporation, and (ii) that certain Asset Purchase Agreement executed as of the date hereof between Buyer and Seller regarding the Abbreviated New Drug Application filed with and approved by the FDA for manufacturing and marketing Ibuprofen 200 mg.

8.09    Joint Instructions.    Seller shall have executed and delivered joint written instructions to the Escrow Agent to release the Escrow Amount to Seller.

### ARTICLE IX.
### GENERAL

9.01    Termination.

(a)    This Agreement may, by notice given prior to or at the Closing, be terminated:

(i)    by the mutual written agreement of Buyer and Seller;

(ii)    by either Buyer or Seller if a material breach of any provision of this Agreement has been committed by the other party and such breach has not been waived;

(iii)    (A) by Buyer if any of the conditions in ARTICLE VIII have not been satisfied as of the Closing Date, or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date, or (B) by Seller if any of the conditions in ARTICLE VII have not been satisfied as of the Closing Date, or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with its respective obligations under this Agreement) and Seller have not waived such condition on or before the Closing Date; and

(iv)    by either Buyer or Seller, if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before November 18, 2011, or such later date as the parties may agree upon.

(b)    Nothing in this Section 9.01 shall relieve any party of any liability for a breach of this Agreement prior to the termination hereof

9.02    Notices, Etc. All notices, requests, demands, and other communications hereunder shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given upon facsimile transmission to the numbers set forth below or upon hand delivery or upon deposit in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, as follows:

EXECUTION COPY

If to Seller:

> Advent Pharmaceuticals, Inc.
> 10 Lake Drive
> East Windsor, NJ 08520
> Facsimile:     (609) 336 7648

With a copy to:

> TEICH GROH
> 691 State Highway 33
> Trenton, New Jersey 08619
> Attention:     Kyle Eingorn, Esq.
> Facsimile:     (609) 890-6961

If to Buyer:

> BioComp Pharma, Inc.
> 22 South Main St., Suite 224
> Doylestown, PA 18901
> Attention:     Pete Valko, Managing Director
> Facsimile:     (267) 224-4484

With a copy to:

> Mission Pharmacal Company
> 10999 IH 10 West, Suite 1000
> San Antonio, TX 78230
> Attention:     Lee Cusenbary, General Counsel
> Facsimile:     (210) 696-6020

If to Escrow Agent:

> TEICH GROH
> 691 State Highway 33
> Trenton, New Jersey 08619
> Attention:     Kyle Eingorn, Esq.
> Facsimile:     (609) 890-6961

or at such other address as shall have been furnished to the other in writing in accordance herewith, except that such notice of such change shall be effective only upon receipt.

9.03   Enforcement; Service of Process.   In the event the parties shall seek enforcement of any covenant, warranty or other term or provision of this Agreement, the party that prevails in such enforcement proceedings shall be entitled to recover reasonable attorneys' fees actually incurred by it in connection therewith. The parties hereto agree that the service of process or any other papers upon them or any of them by registered mail at their respective addresses where

notices are to be sent pursuant to Section 9.02 hereto shall be deemed good, proper, and effective service upon them.

9.04    Bankruptcy Court Jurisdiction.    THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER AGREEMENTS AND TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION

9.05    Amendments and Waiver. This Agreement may be amended or modified by, and only by, a written instrument executed by the Buyer and Seller, except for Section 2.10 and this ARTICLE IX, which shall also require the execution of the Escrow Agent. The terms of this Agreement may be waived by, and only by, a written instrument executed by the party against whom such waiver is sought to be enforced.

9.06    Expenses. Each party to this Agreement shall pay its own expenses including, without limitation, the fees and expenses of such party's counsel incidental to the preparation of and/or consummation of this Agreement

9.07    Section and Other Headings; References.    The section and other headings contained in this Agreement are for convenience of reference only and shall not in any way affect the meaning or interpretation of this Agreement. References to Articles or Sections when used without further attribution shall refer to the particular articles or sections of this Agreement.

9.08    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

9.09    Parties in Interest. This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns. Buyer shall have the right to assign this Agreement to any Affiliate of Buyer. Except as otherwise expressly permitted herein, this Agreement shall not be assigned by any party hereto without the written consent of the other parties.

9.10    No Implied Rights or Remedies. Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any Person, other than the parties hereto and their respective successors and assigns, any rights or remedies under or by reason of this Agreement.

9.11    Exhibits and Schedules.    All Exhibits and Schedules referred to herein and attached hereto are incorporated herein for all purposes.

9.12    Entire Agreement.    This Agreement, together with all exhibits and schedules hereto, embodies the entire agreement and understanding between the parties hereto relating to the subject matter hereof and supersedes any prior agreements and understandings relating to the subject matter hereof.

9.13   <u>Applicable Law</u>.  This Agreement and the rights and obligations of the parties hereto shall be construed under and governed by the laws of the State of New Jersey, without giving effect to conflicts of laws principles.

9.14   <u>Effect of Termination</u>.   If either party terminates this Agreement pursuant to <u>Section 9.01</u>, upon delivery of the Escrow Amount as provided in <u>Section 2.10(d)</u> above, all obligations of the parties hereunder shall terminate without any liability of any party to any other party (but without prejudice to any rights either party may have against the breaching party pursuant to termination under <u>Section 9.01(a)(ii)</u> above); <u>provided</u>, <u>however</u>, that <u>Sections 9.06</u> and this <u>Section 9.14</u> shall survive such termination.

9.15   <u>Approval Order</u>.   Notwithstanding anything to the contrary set forth in this Agreement, in the event that there is an inconsistency between the Approval Order and this Agreement, the Approval Order shall be controlling over the provisions of this Agreement.

**[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date and year first above written.

**BUYER:**

BIOCOMP PHARMA, INC.

By: _____

Peter M. Valko, Managing Director

**SELLER:**

ADVENT PHARMACEUTICALS, INC.

By: _____
Name: _____
Title: _____

**ESCROW AGENT**: (Executing solely in regards to the duties and obligations of the Escrow Agent set forth in Section 2.10 and ARTICLE IX.)

TEICH GROH

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date and year first above written.

**BUYER:**

BIOCOMP PHARMA, INC.

By:_____
      Peter M. Valko, Managing Director

**SELLER:**

THERAGEN, INC.

By: _____
Name: _____
Title: _____
                              9/12/2011

**ESCROW AGENT:** (Executing solely in regards to the duties and obligations of the Escrow Agent set forth in Section 2.10 and ARTICLE IX.)

TEICH GROH

By: _____
Name: _____
Title: _____

EXECUTION COPY

## EXHIBIT A
## DEFINITIONS

"*Acquired Assets*" has the meaning ascribed to it in <u>Section 2.01</u>.

"*Acquired Asset Documentation*" has the meaning ascribed to it in <u>Section 2.01(d)</u>.

"*Agreement*" has the meaning ascribed to it in the Preamble.

"*ANDA*" has the meaning ascribed to it in <u>Section 2.01(a)</u>.

"*ANDA 40-576*" has the meaning ascribed to it in <u>Section 2.01(a)</u>.

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or general partnership or managing member interests, by contract or otherwise. Without limiting the generality of the foregoing, a Person shall be deemed to control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"*Applicable Law*" means any United States federal, state or local or foreign law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any Governmental Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

"*Approval Motion*" has the meaning ascribed to it in <u>Section 5.04(a)</u>.

"*Approval Order*" has the meaning ascribed to it in <u>Section 5.04(a)</u>.

"*Bankruptcy Code*" has the meaning ascribed to it in the Preamble.

"*Bankruptcy Court*" has the meaning ascribed to it in the Preamble.

"*Bankruptcy Case*" has the meaning ascribed to it in the Preamble.

"*Buyer*" has the meaning ascribed to it in the Preamble.

"*Closing*" has the meaning ascribed to it in <u>Section 2.05</u>.

"*Closing Date*" has the meaning ascribed to it in <u>Section 2.05</u>.

"*Confidential Disclosure Agreement*" has the meaning ascribed to it in <u>Section 5.07</u>.

"*Contemplated Transactions*" has the meaning ascribed to it in <u>Section 4.04(a)</u>.

"*Drug Laws*" means the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, the United States anti-kickback statute, or the regulations and regulatory guidance

promulgated thereunder or similar Applicable Laws of any foreign jurisdiction, including those relating to good laboratory practices, good clinical practices, adverse event reporting, good manufacturing practices, advertising and promotion, recordkeeping, and filing of reports.

"*Effective Time*" has the meaning ascribed to it in Section 2.05.

"*Escrow Account*" has the meaning ascribed to it in Section 2.10(a).

"*Escrow Amount*" has the meaning ascribed to it in Section 2.10(b).

"*Escrow Agent*" has the meaning ascribed to it in Section 2.10(b).

"*Excluded Assets*" has the meaning ascribed to it in Section 2.02.

"*Excluded Liabilities*" has the meaning ascribed to it in Section 2.04.

"*FDA*" means the United States Food and Drug Administration, or any successor agency in the United States with responsibilities comparable to those of the United States Food and Drug Administration.

"*FDA Transfer Letters*" have the meaning ascribed to it in Section 2.06(c).

"*Filing Date*" has the meaning ascribed to it in the Preamble.

"*Governmental Authority*" means any government or any agency, bureau, board, commission, court, department, political subdivision, tribunal, or other instrumentality of any government (including any regulatory or administrative agency), whether federal, state or local, domestic or foreign, and including any multinational authority or non-governmental authority which licenses or authorizes or may license or authorize the manufacturing, distribution, marketing or sale of a Product. The term, Governmental Authority, shall not include medical facilities or institutions of higher education including colleges or universities.

"*Governmental Order*" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered by or with any Governmental Authority or arbitrator(s).

"*Intellectual Property*" means intellectual property rights of every kind and nature throughout the world, however denominated, including all rights and interests pertaining to or deriving from:

(a)     patent rights and Know-How;

(b)     trademarks, trade names, service marks, service names, brands, trade dress and logos, domain names, and the goodwill and activities associated therewith;

(c)     copyrights, works of authorship, rights of privacy and publicity, moral rights, and similar proprietary rights of any kind or nature, in all media now known or hereafter created; and

(d)     any and all registrations, applications, recordings, licenses, statutory rights or

common-law rights relating to any of the foregoing.

"*IP Assignments*" has the meaning ascribed to it in <u>Section 2.06(e)</u>.

"*Know-How*" means inventions, business and technical information, know-how and materials, including technology, software, instrumentation, devices, data, compositions, formulas, biological materials, assays, reagents, constructs, compounds, discoveries, procedures, processes, practices, protocols, methods, techniques, results of experimentation or testing, knowledge, trade secrets, skill and experience, in each case whether or not patentable or copyrightable.

"*Other Asset Purchase Agreement*" has the meaning ascribed to it in <u>Section 8.08</u>.

"*Permits*" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted or required by, any Governmental Authority to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound, including all approvals, licenses or permits required by any Governmental Authority to market, offer, sell, distribute, import and export Products.

"*Person*" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, university, college, Governmental Authority or other entity of any kind.

"*Product*" means Carisoprodol 350 mg.

"*Purchase Price*" has the meaning ascribed to it in <u>Section 2.03</u>.

"*Purchased Copyrights*" means all works of authorship and all copyrights, moral rights and other rights and interests thereto throughout the world, whether or not registered, that are related to the ANDA.

"*Purchased IP*" means the Purchased Copyrights and Purchased Know-How.

"*Purchased IP Assignments*" has the meaning ascribed to it in <u>Section 2.06(d)</u>.

"*Purchased Know-How*" means Know-How relating to the ANDA or manufacturing Products under the ANDA.

"*Seller*" has the meaning ascribed to it in the Preamble.

"*Transfer Documents*" has the meaning ascribed to it in <u>Section 2.06(e)</u>.

"*Transferred Permits*" has the meaning ascribed to it in <u>Section 2.01(c)</u>.

## EXHIBIT B

### ASSIGNMENT AND BILL OF SALE

This Assignment and Bill of Sale (this *"Agreement"*) is made as of _____, 2011, by and between Advent Pharmaceuticals, Inc., a New Jersey corporation (*"Seller"*), and BioComp Pharma, Inc., a Texas corporation (*"Buyer"*).

### RECITALS

WHEREAS, Buyer and Seller are parties to that certain Asset Purchase Agreement (the *"Purchase Agreement"*), dated as of September 12, 2011, entered into by and between Buyer and Seller;

WHEREAS, pursuant to the Purchase Agreement, Seller has agreed to sell, transfer and assign to Buyer, and Buyer desires to purchase and acquire from Seller the Acquired Assets free and clear of all liens, claims, encumbrances, liabilities and other obligations and interests, all as more specifically set forth therein; and

WHEREAS, each capitalized term used, but not defined, herein has the meaning ascribed thereto in the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises by Seller to Buyer and the assumption of certain obligations of Buyer by Seller, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree as follows:

1.    Transfer of Assets.  Seller hereby sells, assigns, transfers, and conveys to Buyer all of Seller's right, title and interest in and to the Acquired Assets, TO HAVE AND TO HOLD the same unto Buyer and its successors and assigns forever.

2.    Further Assurances.  Seller shall execute and deliver to Buyer such further documents and instruments, if any, and take such other action, that may be reasonably requested by Buyer to evidence this conveyance, transfer and assignment of the Acquired Assets. Buyer shall execute and deliver to Seller such further documents and instruments, if any, and take such other action, that may be reasonably requested by Seller to evidence this acquisition of the Acquired Assets.

3.    Assignment Without Consent.  Nothing in this Agreement shall be construed as an attempt to assign any contract rights that constitute the Acquired Assets without the consent of the other party thereto if the attempted assignment thereof without such consent would constitute a breach thereof. If any such consent is not obtained prior to the date hereof, Buyer and Seller agree to cooperate with each other in effecting appropriate arrangements designed to obtain such consent or assure that Buyer will receive the benefits of the contract rights until such consent is obtained.

EXECUTION COPY

4.    <u>Inurement.</u>  The conveyance, assignment and transfer herein shall be effective as of the Effective Date, and shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

5.    <u>Terms of the Purchase Agreement.</u>  The terms of the Purchase Agreement, including but not limited to Seller's representations, covenants, and agreements relating to the Acquired Assets, are incorporated herein by this reference.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and terms hereof, the terms of the Purchase Agreement shall govern.

6.    <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

EXECUTION COPY

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first above written.

**BUYER:**

BIOCOMP PHARMA, INC.

By:_____
        Peter M. Valko, Managing Director

**SELLER**:

ADVENT PHARMACEUTICALS, INC.

By:_____
Name:_____
Title:_____

[SIGNATURE PAGE TO ASSIGNMENT AND BILL OF SALE]